1953. Ms. Curran, we're ready whenever you are. Take your time. Good morning. May it please the court. I'm Cynthia Curran with the law firm of Chris Page and Curran from Raleigh, North Carolina. I represent the plaintiff appellants Susan Turner individually and Susan Turner as administratrix of the estate of her husband, deceased Roger Turner. This is a case with a compelling set of facts. Roger ended up drowning, dying. Susan ended up being in the water for 12 hours overnight in the Albemarle Sound. She survived but she has PTSD and other severe medical problems. We assert that the facts establish that the Coast Guard undertook the mission for the search and rescue of the Turners but failed to complete the mission. There were three places they were told to search. Perquimans River, Pasquotank River, Man's Harbor. They searched two locations. They did not search the third, the Perquimans River. That's where they were and this incident happened on July 4th, 2007 in the evening and Roger's body washed ashore on Saturday morning, July 7th. Susan ended up coming ashore the next morning. So according to the GPS, the boat was coming down the Perquimans River towards the Albemarle Sound. Ms. Kearns, before you get into the facts, let me just ask you this. You used the word search and I guess that's the question here. Yes, sir. When do you say the Coast Guard initiated the search during that initial helicopter flyover? Is that your position? Yes, your honor. We would assert that based on the Coast Guard's own definition of a sortie, which we attach to our reply brief. A sortie is a movement of the resources. So that is a use of their resources. They used the Jayhawk helicopter, which was number 6001. It searched from 130 to 215 in the morning up and down the Pasquotank River. It had four employees on board, a pilot, a co-pilot, a mechanic, and a swimmer. They all used night vision goggles and when they finished that search and walked back into the air station, the commander, Commander Walton, said log that time to the Turner case and assign it a number. Let me ask this because it seemed to me that that was an efficient use of the resource on its way back from a different mission. And if your position is correct, doesn't that almost encourage the Coast Guard not to do anything like that? Because the law is clear that until they actually engage in a search, they're not liable. So if your position is that anytime they think about doing anything related to another rescue operation, they're on the hook. That doesn't seem to make sense to me. Your honor, but when you when you add the helicopter search with the boat search from Oregon Inlet, those two together, I would submit clearly show together the undertaking of the mission. Okay, when do you, the boat search, when did that occur? The boat search occurred at, it started from Oregon Inlet at approximately between 7 and 7 30 on July 5 in the morning. Right in the morning. That's an almost eight hour, six hour difference. Yes, your honor, but the Coast Guard has asserted that the only activity that they were involved in was the fly over down the Pasquotank River, and they have ignored my reference to the Oregon Inlet boat search. Because when you acknowledge it, it shows they undertook the mission. I deposed eight Coast Guard employees. None of them could tell me who ordered the boat from Oregon Inlet, though I asked. But the boat was ordered from Oregon Inlet because we have that in the record. It left Oregon Inlet on a trailer at approximately 7 30. It drove up to Man's Harbor on the trailer. They put it in the water at 9. So that was one of the three places that needed to be searched. It was either Pasquotank, Perquimans, Oregon Inlet. So of the three places, the helicopter went down the Pasquotank, and it would have only taken 15 minutes to go down to Perquimans, but they didn't. Well, with respect to the boat search, though, there really is no definitive evidence in the record with respect to time of death, with respect to the proceedings. So you've got 7 30, 8 o'clock boat search. Your client washes ashore about an hour later. How does that help  We can say it one more time. I'll make sure I get it right. You said that your client, Susan Turner, washed ashore about 9 o'clock. Is that right? Yes, sir. 9 20. Okay. So you have a boat search about 7 30, 8 o'clock. So about a one hour difference. How does that help her claim with respect to negligence? What I'm trying to figure out is what is the import of that boat search? How does that advance your claims in this case? I think, Your Honor, it advances the claims by establishing that the Coast Guard did undertake the search, even though the label they are putting on it now is that they did not. I think for purposes here, we're assuming that purposes that leads to this question, but I thought that even after the Coast Guard undertook a search, there was no liability unless the search left the people in worse condition they would have been without the search. How can you possibly establish that on this record? Well, Your Honor, if I had an evidence that it would have only taken 15 more minutes to search the Perquimans going back to the middle of the night, but yes, in response to my colleague, you said you take that middle of the night flyover with the 7 o'clock or 7 30, whatever it is, boat search. You don't do one separately. Now, if you're just relying on the middle of the night, then I think you run into problems about whether, in fact, there was a search initiated for to find your client. Your Honor, I would submit that we would have even more evidence on this if they had not destroyed the tapes. Okay, but that's, you know, it's like the the things in the circus. If I press down one argument, then you come up with another, but then you're conceding that if you have to rely on the search, quote search, beginning with the flyover, then you don't have a cause of action? No, Your Honor, because I would assert that the Coast Guard was negligent when they landed that helicopter and didn't go ahead and fly around to the Perquimans when it was only taken. They have it. They make the determination of when they're going to search, right? That's within their their discretion. Yes, Your Honor, but as I resources they are undertaking the mission, they don't get to just choose when they put the label search on it. They have said that it was only a stage of pre-com and ex-com, which is communications, where clearly it was way beyond communications. Communications is only when you call out on a radio. Well, correct me if I'm wrong, but I thought that the helicopter was returning from another mission and did this examination on its way. When I deposed Officer Avilsgard from District 5, he said that he had ordered that helicopter to be diverted from the other search and sent to search this for the Turners. We would submit that in my reply brief, I quoted from all the depositions of the Coast Guard deponents and they all used the word search. Yes, they were searching on the river for the Turners. They called it a search. It's only now that the suit has been pursued that they're now saying that wasn't a search, but what's the difference? They looked, they used resources, they used their employees, they used their night vision goggles. They were actually physically searching. Otherwise, if you say that that doesn't count, then they could never be held responsible because every time they go out on a mission, they can say, well, we were we were just we were just following up on something else. We weren't really undertaking that mission. At which, at what point? Well, they sure would have picked him up if they had seen him there in the water, wouldn't they? On on the river that they went up and down. I think they would have, Your Honor. Well, tell me this. Do you contend that, let's assume for a second, that the rescue started at one o'clock in the morning when they were flying the helicopter? That's the earliest it could have started, right? Well, according to the Coast Guard, that's the earliest that they were put on notice. The 911 call came in at 1238 to, well, at 1231, Roger's father, Sr., called 911. 911 report shows at 1238 they notified the Coast Guard. Okay. And then the Coast Guard, at around one o'clock in the morning, diverted this helicopter. Yes, sir. So that would be the absolute earliest that you could say that the search began. Is that right? Unless you would consider our argument on the destruction of the tape. Well, no. Let's leave that Don't you agree that spoliation is, A, not a tort in itself and, B, within the discretion of the trial court? Your Honor, I think that this court has the authority to direct the trial court regarding spoliation. And in this case, the missile report from Coast Guard shows its first entry at 9 58 p.m. on July 4. A second entry at 11 30 p.m. on July 4. So if the first time that the Coast Guard got notice was actually one o'clock in the morning, there is no reason, there's no basis in fact, for there to be an entry at 9 58 p.m. and another at 11 30 p.m. Well, but the record says that the 9 58 entry is just what the guy called a placeholder or something like that. But, Your Honor, I took his deposition and for every single other entry throughout his entire entries for the day, I could link it back to a radio log or definitive action in another document. That was the only entry in which there was no basis for the fair argument. But the problem is you don't have anything linking your client to the 9 58. You don't have the radio in the boat. You don't have their cell phones. So I just don't know what evidence there is to get. Well, Your Honor, that's my point based on spoliation of evidence theory that if they had not destroyed the tape, I would have that evidence. But see, you don't have one end of it. What makes you think that the other end is going to be there? And you don't have your end of it. You don't have, as I say, you don't have the cell phone records. You don't have the radio in from the boat. But there's no way to that he didn't use the radio. He could very well have used the radio. Well, that's the problem with the case is there's no way to show what happened. But Your Honor, if they had not destroyed the tape, we would have that evidence and we would have evidence of the discussions back and forth between the different Coast Guard stations from Atlantic Beach to District 5 to Elizabeth City Air Station. We would have all that data. We would have what plans were made, who decided to search, when they decided to search, and we'd have it in their own voices. We would have a Mayday call from Roger. Do you have evidence about this that you introduced before the trial judge, the district judge, all about all this, what happened with the tapes? I filed motions, you know, this was dismissed a motion for summary judgment. Do you have file evidence on that or just affidavits? We were not given an opportunity to present live evidence. It was only summary judgment evidence. I truly believe that if the court, you know, there have been other cases in which the Coast Guard has been reprimanded for failing to save the tapes. In U.S. v. Enriquez, which is the Second Circuit, we put that in our brief and the Second Circuit scolded the Coast Guard and said, don't tell us anymore that you're not going to save the tapes for budgetary reasons, because these are important. They require, they offer due process. Don't ever tell us you're not going to save them again. And they required the U.S. attorney to send a formal letter to the Coast Guard, including Elizabeth City Air Station, and to ask them what their response was in a report back to the Second Circuit. When I asked for copies of that document, the Coast Guard could not find it. So they've destroyed the tapes. They can't find the correspondence from the Second Circuit. We submit that the Coast Guard should be found responsible for preservation of evidence, just like any other party should be found responsible. I've done that, Mr. Ross, at council table, so don't feel bad. Don't worry, the Coast Guard can clean it up. That'd be a different case, yeah. Good morning, Your Honor. May it please the Court, I'm Bruce Ross for the United States Department of Justice Aviation Advocacy and Litigation Section in the Civil Division. I have with me at council's table today, I'd like to introduce Captain Select John Luce, who represents our client agency today, the Coast Guard. Your Honor, this is a very important case of the Coast Guard today. This is a case regarding agency discretion, whether the Coast Guard has the discretion to make choices during the critical information gathering phase of a search and rescue event, and whether they're to be scrutinized and perhaps even have liability imposed upon them during this critical phase when they're still trying to figure out what facts are accurate, which ones aren't, where do they need to find new evidence. And imposing at this stage the burden, the contemplation that these efforts might be scrutinized and subjected to liability will merely suppress the open, the wide net they should be casting trying to find all this information. Basically in a phrase, not all searches are created equal here, Your Honor. I believe Judge Diaz was pursuing the question with Ms. Curran, that basically not all searches necessarily are in effort or in support of an active rescue operation. There's a distinction here, Your Honor, and it's one the plaintiff has failed to recognize throughout the entire case. When they first get the information of a case, whether it's one o'clock in the or whether it's from some Mayday call or something like that, the Coast Guard has to respond with finding information out. They put out a uniform broadcast, they start calling marinas, they send somebody over to a marina and run up and down the back of the boats to find out if that boat might be there. These are all pre-communications, pre-com, and under this rubric of pre-com, they're in, they're trying to find more information to ascertain two fundamental factors. Is there really an emergency? Is there distress? And secondly, if there is distress, do we know where it is and can we find it? Can we start a search around that area? If you don't have the proof of an emergency, you're going to waste your time, obviously. And if you don't have a reasonable idea where to start your search, you could start launching a whole lot of aircraft and vessels, and basically every one of these assets you send out is on an egg timer. You send a boat out looking someplace, it turns out it was not a very good place to look after five, six hours. Either the crew runs out of time or you run out of gas, and so they have to come home. So you have to narrow the area of the search. These are not questions, discretionary issues that should be subjected to the inquiry of a court. They should be basically set to the side and the rigorous review and scrutiny of the judicial inquiry here should be reserved for the response phase of the Coast Guard. What about when this helicopter flew over the river at approximately one in the morning? Is that part of the rescue effort? Your Honor, it would be part of the greater search and rescue evolution, but to answer your question, no, it was not an active rescue operation. I'm not making that term up. In the Heard case, both this court and the district court referred to an active rescue or active search and rescue operation. That's distinct from normal searching. Even going to the files and finding out what this boat, the numbers are, and what the capabilities are, that could be convened a search. Okay, but it's one thing to check out the registration of the boat or whatever it is you're checking out. I'm sure that if these people in the helicopter had flown over this boat and seen it there, they would have gone down and checked it out and picked up the people if they could have, wouldn't they? Your Honor, assuming they had the gas remaining, yes, they probably would. And if they didn't have the gas, they'd probably have the Elizabeth City boat come right out and pick them up. So yes, Your Honor, they probably would. So isn't that when the rescue started at a minimum, when that helicopter was flying up the river towards Elizabeth City? Respectfully, no, Your Honor, because what's critical here, and I draw now from the earlier decision of this court and the district court in South Carolina from Heard, there are different phases of the I've just finished talking about before, trying to gather information, a wide net, asking anybody and everybody, regardless of who they are, have you seen this boat and can you give us any information? Including a helicopter transiting at 135 in the morning from another search that was an active rescue operation for a jet ski. Okay, so they put a sign up, a big red sign that says we are now beginning the search. How are we to know this? Is it all decided after the fact by testimony from your witnesses? Because that doesn't seem like such a really good way to determine when the search began. Your Honor, if we could only have a red sign. In fact, the people who are running the operation in the command center at Atlantic Beach, North Carolina, they know which phase they're in right now. And the deposition of Chief Petty Officer Sudsbury, who was the command duty officer in South Carolina's sector at the time, he testified that he knew exactly when he was in the information gathering stage. He even told people he was in that stage. In fact, between one o'clock in the morning and about 1 15 in the morning, shortly after Mr. Sudsbury got that call saying here's the information from Mr. Turner's father, he called Mr. Turner's father, got more information, then called him back and told him I'm not going to go into a search right now, I don't have enough information. We have to confirm there's actually an emergency here and we don't really have enough information to know where to start a search. So he basically filled out the the form, if you will, to say I'm in the information gathering stage. There's an uncertainty and that's what the Coast Guard associates with that phase. Uncertainty. Then the evaluation phase and then you go into the response phase. When you get to the response phase, there are objective characteristics obviously. Airplanes are launching, boats are getting underway, you have a whole search and rescue plots and who's going to be where and altitude separations, things like that. But there's also the acknowledgement that we have these two critical pieces of information. We know there's an emergency and we know where to look. What about the 7 30 launch of the boat, which Ms. Kern also thinks is important? Was that the initiation of the search at that point? No, your honor, it wasn't. I mentioned in passing, from nine o'clock in the morning, at night, about the time that Ms. Turner says she fell overboard, until 9 15 the next morning. Sector North Carolina had only one active search and rescue operation for a jet ski. The jet ski was reported to the Coast Guard about 8 40 at night and they immediately responded because in that case, they had a witness saying they saw this guy on a jet ski going underneath the Wright Memorial Bridge in Kurutuk Sound and that was the last time they saw him. He was overdue, didn't have that much gas and he hadn't come home. Now a jet ski is open and exposed to the elements and basically they'll have a life preserver on but they're subjected to the elements of the sound. So they immediately responded to that as basically the response phase. They skipped right to response. In this case, they didn't have that information. In fact, what you don't hear from the plaintiff is what Chief Petty Officer Sudsbury got from Mr. Turner Sr., the father. Was another a location? So now there were four. I'm sorry? The father suggested well maybe it's still somewhere else so there were four possible locations. Well actually your honor, there are even more than that but I was going to say first that the element of is there even a danger here because the father had to acknowledge that this is a nice size boat, it's well provisioned, they got food and water, they're well experienced on the water, both of them, they're both good swimmers. In fact, they got flares, an anchor, they got a radio, a VHF radio and they've also got a couple or three phones on board and he also mentioned that I can call them on the water normally and I've been trying to call them and they won't answer their phone. So they're basically, the Coast Guard came away from that conversation saying I've got a couple of 41 year old adults on the 4th of July who haven't come home on time and his dad is worried about them. I don't see an emergency here yet but I'm going to start asking questions and so he launched pre-coms and they sent a pre-com notice that is to say do your initial communications and check the marina's first light in Oregon City asking about Man's Harbor and they also asked Elizabeth City on the Pasquotank River start checking along there too and see if any of the marinas there reported they came in there. So they're doing all this gathering information but they still didn't believe they had an emergency. Now, Your Honor, you also mentioned about how many locations were there. When you say he could have gone the Perquimans, the Pasquotank or way down to the south of the Sound, Man's Harbor, everywhere in between there is a search area because if they transited they could have lost their engine and they would have been drifted all the way to the east, the prevailing winds that night, all the way over to the eastern edge of the Outer Banks. Furthermore, they started from and presumably would return to Little River where they lived. So there's a third river and there's also what plaintiff fails to recognize. The father also mentioned there might have been this cabin. He didn't know whose it was or where it was but he mentioned he might have gone to a cabin. So now that's, you really don't know where to start this search at that point. Did you handle this case? I'm sorry? Did you handle the case? Yes, Your Honor, myself and Mr. Hoddle. Well, I'm sure you'll remember this. There was, the government was about to go to arbitration in this case and then came in front of the district court and had not filed a motion for summary judgment on this issue. So obviously you thought that even though you're doing a splendid job this morning that there was a possibility that a jury or fact finder might go the other way. So what besides the dialogue with the district court changed your mind? I mean the fact, these facts that you're telling us were exactly the same at the time when you decided not to, initially decided not to file for summary judgment, right? Those facts haven't changed. The law didn't change. True, the law and the facts have not changed. And Your Honor, recognizing the fact that there were two different summary judgment motions and one a year before had actually three separate elements in it. At that time it was a tactical decision. What do we have clear evidence on and clear law on and where do we spend our time arguing? Right. And so pruning away the primary law. Not only weren't going to go that point as a tactical, even though the same law, same facts on this issue, and that you also were going to go have case arbitrated or mediated, I guess it was. Court-assisted settlement. Court-assisted settlement. Yes, Your Honor. In fact, we had already conducted private mediation a couple months before, which was not fruitful. But what best I can say is we are taught at the Department of Justice from day one, we're always open to settlement negotiations. It takes an affirmative representation to say no, I will not. All I can say is when we agreed that we would submit to court-assisted, magistrate-judge-assisted mediation, literally the day before we went to the pretrial conference with Judge Boyle, we did not know what was about to transpire at that pretrial conference. The pretrial conference made it very clear to me that from the judge basically reciting the so sure that he had to have a trial that next week. Well, let me ask you another question. I'm really sort of stymied by this 905 or whatever it was record, this place saver. 958. Yeah, what does that mean, a place saver with this case at 958? I mean, it'd be one thing if it place saved at an even number even. It just seems very weird. Maybe you can give me some help with that. I will try, Your Honor. But first, may I just say, the bottom line, I think, is all of you who have already observed, it doesn't amount to affirmative proof. But that being said, Pen Aster Dender in his deposition acknowledged he's only filled out these missile reports, these electronic files, like five or six times in his career. He wasn't terribly adept at it. However, he used this personal, he used this label of response resource requested and inserted it at the very top ahead of the first initial notification for his own little placeholder. Plaintiff's counsel suggests that he's never done that ever before. In the Jet Ski case, he did the exact same thing that same night. I'm not understanding what he did. In other words, he, I mean, how did he pick 958? All I can say is that his deposition, he said it was random. So, does he have a whole record, like 959, did he start another file? And at 957, he'd started just still an earlier file on some other case? No, Your Honor. Only in the two cases that were coming up then. At 958, at roughly 945 to 9 to 10 o'clock that night, there were basically the confluence of three different cases that were affecting that boat station Okay. They're wrapping up fireworks along Elizabeth City and the Coast Guard with their one boat was searching vessels and boarding vessels and checking on safety issues. Okay. And that's where they're actually deployed at 958. Shortly thereafter, within an hour or two, they were tasked to go over to search for the Jet Ski and they spent a few hours looking for the Jet Ski along the eastern Kuruktuk Sound, just west of the Kuruktuk Sound. So, they were searching for the Jet Ski then. So, they came back to Elizabeth City and with about two hours after they got back, that's when the boat was discovered by Lonnie Bunch at nine o'clock in the morning and they were launched again and they went off to Reed's Point on the Coquemins River. Did they put 958 down for some other search too? Not 958, but it was random to the effect of, you know, the Jet Ski case, he chose 0015 Zulu. So, 815 at night. We used 15 instead of a 58, final two digits. Is it an appropriate use? That had nothing to do with when they began the search on the Jet Ski. No, Your Honor. And in fact, the 11 30 p.m. number we've heard as well basically is the entry at the top, the very top of this missile case. It can be entered by anybody, you know, the person who initiates the case. It can be done by a reviewer. It can be used, I'm told, it can be used for when did we first get notified about the case. It can also mean when do we think the accident occurred. There was no testimony. There's no evidence to say what this 0330, 1130 at night, number, time at the top of this missile report means. Plaintiff would have you believe that means we knew something earlier than we did. Well, let me ask you about that because you make a pretty, you provided a pretty compelling summary of the evidence tending to show the difference between the investigative phase and the active search phase of this operation. But Ms. Kern responds that the reason why you're able to do that without being impeached is that your agency destroyed the very evidence that might have showed otherwise. And then she points to the second circuit case that apparently, at least according to her, suggests that there is an order in perpetuity that prevents the Coast Guard from destroying this type of evidence. So why don't you respond to that? Working from the back forward, I suppose, USV Enriquez, criminal case. Coast Guard had possession of the evidence because they developed the evidence and on a multiple of occasions up in the second circuit, the U.S. attorney came up and didn't have the recordings. And so judges began to get frustrated and said don't show up without that evidence. That has no relation to the civil case here. In that case the Coast Guard clearly had noticed that this was going to be in litigation because they were the investigating officers that had seized the evidence. I So that's an entirely different situation we have here. In my brief, it has a subsequent recitation that this doesn't apply to civil cases. This isn't the same kind of admonition. So what is the test for when you might find yourself in litigation in the civil context? Does the party, in this case the Coast Guard, have a reasonable belief that there's going to be a claim or litigation arising from this situation? Well, in our litigious world, shouldn't you just assume that that's going to happen and plan for the worst? It all boils down to reasonability, your honor. And you're right, there's lots of litigation. But to burden the Coast Guard that every time they launch a boat, search one of the boats there in Pasquotank River during the 4th of July, that they might get sued, there's a certain level of we've gotten used to not being sued every time we go out. It's a rare event when they do get sued when they go out. So the gentleman, Commander Dixon, who was in charge of the Sector Command Center that made the decision to routinely tape over that and cycle that tape back to the 30-day cycle, he determined we don't have any claims against us. Nobody's asking, you know, an administrative claim. We haven't gotten a FOIA request yet for anything. And his subjective belief, his reasonable belief, was we weren't going to be sued about that. Let me ask you about that. I think maybe your argument went a little too far. Surely not every search in which the Coast Guard engages results in a person being in the water, certainly in the water for long periods of time, and another person being dead. I mean, this must have stood out as an unusual case and perhaps a reason to keep the record. I mean, if your man, after you said, which is what I was understood was the case, that you keep the records for 30 days. So you don't know just, you're not just destroying them immediately. 30 days out, you know the situation here. And you're right, Your Honor. But by way of understanding the condition of the situation here, the recording devices they've installed in the command centers aren't really designed for recording evidence. They use it, it was originally funded and deployed, in order to have a means by which the watchstanders on a busy watch could run back the clock and run back the tape and say, let's listen to that again and make sure I get it right. And in this case, they did that. The oncoming watch the next morning, Mr. Sawyer, tasked the new radio man that morning to go listen to the tape again and tell me if there's a Mayday call. No Mayday call was found. The original watchstanders that night sat there listening 24-7 and didn't hear a Mayday call either. So that's what they use it for. They realize, however, that they're expected to retain it if there's usable evidence on it. And so the original use wasn't what they're saving it for in this, would have been in this case. But you have to, I would hope you would appreciate that that's why they didn't, they don't routinely throw it away if they know this is going to be used for evidence. I'm sorry, Your Honor, I didn't get back to your question on, I'm sorry, Judge Diaz, on the spoliation and the Mayday call. But I say I'm out of time. You can finish answering the question, I'll give the other side of the list. Thank you, Your Honor. As to the spoliation claim and if we destroyed evidence and the impact of that, first, as I just mentioned, two different radio men listened to that, one live and one after the fact and reviewed it and didn't hear a Mayday call. There's no record in any radio log and any missile that a Mayday call was made that night from 9 o'clock at night until 9 p.m. to 9 a.m. the next morning. There's no replies by any other mariners who heard the broadcast that said if you see the Nobitchin boat, the Turner's boat, reported to the Coast Guard and nobody reported hearing that Mayday call as well. And the evidence is overwhelming that nobody was on the boat after Ms. Turner said she fell off the boat. Again, nothing was deployed, the anchor wasn't deployed, the flares, nobody made a phone call on those cell records, the radio wasn't even tuned up to the Mayday frequency, channel 16, it was channel 68. So there's no evidence on the boat that anybody was doing anything to the boat. It drifted into shore once Mrs. Turner fell overboard, in effect. So there is no real evidence, nothing to suggest to us that there was a missed call or that anything would have been on if we still had them today. Thank you. If I might, just some quick points. One is as to the destruction of the tapes, Commander Dixon made a decision to destroy those within the 30 days. In the Stevenson case, which was an Eighth Circuit case, which I had determined in a railroad case where the dispatch tapes had been recorded over top of after their 90-day routine time frame, that that was nevertheless spoliation of evidence and that showed bad faith and the intent to not preserve the evidence. In that case, they went past the 90 days, they re-recorded over top of them, and they couldn't have gone back. In this case, Commander Dixon put in his affidavit that within the 30 days, 30 days is how long the Coast Guard usually maintains these, within the 30 days, he made a conscious decision not to save it. He said in his affidavit he knew there had been a death and that Susan had been in the water, but he made a decision not to save it. And I would submit to you that that is far more egregious than letting the time elapse, letting it just be re-recorded over top for budgetary reasons. He made a conscious decision, that is intentional, and we would submit that that intentional act is a solid basis for sanctions. Well, let me ask you this about the spoliation claim. The district court found that it lacked subject matter jurisdiction to address the spoliation claim, and you don't make any argument at all in your appellate brief with respect to that. Your Honor, as a student, I had asserted two things. I had asserted a spoliation tort claim, which as I understand, he would have, he asserted I needed to go through administrative process, but what I've pursued at this point is the motion for sanctions, which based on, as I understand it, the Sylvester case, which is the Fourth Circuit case, the federal court has the inherent authority to sanction for spoliation separate and apart from a tort claim of spoliation. So I have proceeded down that avenue and asked the federal court to sanction the Coast Guard for not following what Henriquez had said with their own Coast Guard claims and litigation manual said that they must preserve evidence irrespective of whether it helps them or hurts them. I understand. I don't want to take up any more of your time. I'm sorry, go ahead. What are the damages for the tort of spoliation? But, Your Honor, I have... What are they? What I have asked for is sanctions for the court and as I under... Well, that's sanctions, not a tort. Right. And so I, the court has said that I could not proceed with the tort. However, I have appealed the basis to proceed with seeking sanctions and the court may decide to give inferences in favor of the party that is the victim of spoliation by leveling the playing field. The court can rule in favor of that party on viability at summary judgment stage, inter-default judgment. Okay, well, let me say this. Suppose that we took the, we gave you every benefit of saying that, yes, there was a Mayday call. Call for help at 958 or whatever the time was. And the Coast Guard, as I understand it, has discretion to determine when they are or are not going to begin a search. Now you, not even, nobody claims they began a search at 958, right? So where does that get you? Your Honor, had the Coast Guard, if there was a 958 call and had the Coast Guard sent the boat that was requested, it was a specific 21-foot boat... The Coast Guard has the ability to determine when or when they will not begin to search. It's within their discretion, right? But I'm saying that a request was sent out, they just didn't comply with it. I understand that, but what I'm saying is, isn't that within their discretion? Well, if the request already went out, I think the discretionary function does not kick in once they have accepted the obligation. The determination of when they're going to begin a search lies within the Coast Guard's discretion. The 958 call makes no difference one way or the other. Your Honor, as I read the missile report, the 958 call shows that they accepted that call and ordered a boat to be sent, which puts it beyond discretionary function into action. What boat did they ask to be sent? It was the utility, it was a, the request was for a 21-foot utility boat from Elizabeth City Air Station. They did that in response to this 958 call? They didn't send it, but the order went out to send it. It says, response resource requested, and it put UTL, which means utility boat, 21, and then the rest of the numbers. The 21 at the beginning means a 21-foot boat. So what I'm saying is, that also makes a difference in the wrongful death claim for Roger, because if the Coast Guard did receive that 958 call and they did order that boat, which they did order, then they undertook it at that point, and they should have sent somebody at that point, and you wouldn't have to wait till one o'clock for whether Roger was still alive, which made a big difference in the timing on the wrongful death claim. Well, but you don't know what happened to Roger. He could have hit his head on the boat and rolled over the edge and drowned at 930. Well, Your Honor, we do have an autopsy, and we have the affidavit from the Gilliland, who's the medical examiner for eastern North Carolina, who said there was no damage to the body. It was a drowning. So there's no evidence that he hit his head. Let me ask you this. Let's go back to the question that Judge Diaz asked earlier. What did the Coast Guard do that made these people's condition worse than it was before they started the effort? Your Honor, there was a call from North Carolina Wildlife offering to help, and Antonio Williams from North Carolina, when was that? It was, as I understand it, around 2, 2.30 in the morning. So when the 911 call went to Coast Guard, well, when 911 notified Coast Guard, they also notified North Carolina Wildlife. North Carolina Wildlife had two officers on duty, one on the Pasquotank River in the water on a boat, one in the Chawan River on a boat. I have evidence from Norman Watts, who is the head of the search and rescue for wildlife for North Carolina. Okay, so how did it make the Turner's condition worse? Because the Coast Guard did not ask wildlife to come and help, even though wildlife offered to come and help that night. How does that change what's going on with the Turners? Presumably, Ms. Turner is still out there hanging on a crab pot, and Mr. Treadingwater, or perhaps, unfortunately, dead. And Norman Watts said he would have gone. He knew the Turners. He would have gone, and he was the head over Mark Ritchie. He said he would have gone. That doesn't change their position. I submit that if Coast Guard didn't go and they didn't allow North Carolina Wildlife to go, North Carolina Wildlife could have saved Roger's life and could have prevented Susan being in the water for 12 hours. And they dissuaded North Carolina Wildlife from pursuing it, and that worsened the condition. The lights were on all the way around the boat. Anybody that had gone down that river would have seen the boat up against the shore with the lights all the way around it. The GPS was in the boat. Anybody could have gotten on the GPS, followed it backwards, and found exactly where the accident happened. There was plenty of ways for the North Carolina Wildlife or Coast Guard to locate them, while Coast Guard also had forward-looking infrared and night vision goggles. Do you actually have competent evidence of what Mr. Watts said? As I recall, that evidence was presented through the testimony of the decedent's father, not direct evidence of what Watts would have done or not done. Richard Twitty, and I would submit to Your Honor, first of all, that I would submit that comes in as a hearsay exception under both present sense impression and under excited utterance, because Mr. Watts, Officer Watts, knew Roger, and he knew Susan, and he knew the family. It wasn't an excited utterance. I read the record. It was as soon as he found out that Roger had died, and he came to the home in his uniform, expressed his condolences. He was upset. He said, I would have gone. Had I known, I would have gone. We would have gone. And so we submit that was a present sense impression. We believe it was an excited utterance. He'd known him all his life. He knew this man, and he says he would have gone. And he had won the Search and Rescue Award for North Carolina Wildlife the previous year. He was good at Search and Rescue. Thank you very much. We will come down and greet the lawyers and then go directly to our last case.
judges: Diana Gribbon Motz, Albert Diaz, John A. Gibney, Jr.